**Anthony J. CALI, Plaintiff,**

v.

**JAPAN AIRLINES, INC., et al.,
Defendants.**

**No. 73 C 1596.**

United States District Court,
E. D. New York.

Aug. 20, 1974.

**1122**

Paul H. Blaustein, New York City (Sandoe, Hopgood & Calimafde, New York City, of counsel), for plaintiff.

Donald E. Degling, New York City (Fish & Neave and James M. Estabrook, Jr., New York City, of counsel), for defendants Japan Airlines Co. Ltd., and KLM Royal Dutch Airlines.

Louis H. Kurrelmeyer, New York City (Hale Russell & Stentzel, Alan D. Sugarman, New York City, of counsel), for defendants Scandinavian Airlines System and Scandinavian System, Inc.

### MEMORANDUM and ORDER

DOOLING, District Judge.

The claims of the Cali patent (No. 3,265,290) relate to a modification introduced into JT–4 jet engines in which the seventh stage vane and shroud assembly of the low pressure compressor is affixed to the fairing by welding or by tie-rods. The plaintiff alleges that the defendant international air carriers have infringed the patent by using JT–4 engines so modified in their flights to and from the United States and their overflights of the United States in the course of the regular prosecution of their scheduled air services to this country. It is not claimed that any defendants either made or sold any engines covered by the claims of the patent in the United States. It is claimed that they have regularly used the patent within this country in their regular air services to this country. Plaintiff points out, and it is undeniable, that all three defendants are major transoceanic carriers and that their passenger and freight services to the United States and over the United States are regular, of very considerable extent, long continued, and supported by ground service, marketing facilities, etc. Defendants' uses of the engines have been exclusively for the flight needs of their aircraft, and all three defendant carriers are foreign carriers and are subject to the restrictions of law applicable in this country to foreign carriers. All three are authorized by the CAB to conduct the air services to and from the United States which they are conducting and, in that sense, the entries of their aircraft into the United States are authorized entries. The defendant aircraft are "aircraft of other countries," and are "aircraft of" their respective national states.

The defendants contend (without conceding that the patent is valid or has been infringed) that, even if the patent is valid and the engines used in certain of their aircraft would be infringing engines if made or sold or used in the United States, their use of the invention of the patent in their aircraft does not constitute infringement of the patent because of the provisions of 35 U.S.C. § 272 and the provisions of Article 5ter of the Paris Convention for the Protection of Industrial Property of 1958, which

came into force for the United States on January 4, 1962, and of Article 27 of the Chicago Convention on International Civil Aviation of 1944, which came into force for the United States April 4, 1947, to both of which conventions the United States, Denmark, Norway, Sweden, Japan and The Netherlands became and are parties.

Section 272 of the patent law first appeared in the codification of July 19, 1952 (66 Stat. 812). So far as relevant it provides:

> "The use of any invention in any . . . aircraft . . . of any country which affords similar privileges to . . . aircraft . . . of the United States, entering the United States temporarily or accidentally, shall not constitute infringement of any patent, if the invention is used exclusively for the needs of the . . . aircraft . . . and is not sold in or used for the manufacture of anything to be sold in or exported from the United States."

Article 5ter of the Paris Convention is very similar in language. It provides:

> "In each of the countries of the Union the following shall not be considered as infringement of the rights of a patentee:
>
> \*　\*　\*　\*　\*　\*
>
> 2. The use of devices forming the subject of the patent in the construction or operation of aircraft . . . of other countries of the Union, or of accessories to such aircraft . . . , when those aircraft . . . temporarily or accidentally enter the country."

The Chicago Convention on International Civil Aviation, at least in form, seems much more inclusive in defining the exempted uses, although its language presents some difficulty. It provides in Article 27:

> "(a) While engaged in international air navigation, any authorized entry of aircraft of a contracting State into the territory of another contracting State or authorized transit across the territory of such State with or without landing shall not entail . . . any claim against the owner or operator thereof . . . by or on behalf of such State or any person therein, on the ground that the construction, mechanism, parts, accessories or operation of the aircraft is an infringement of any patent . . . duly granted . . . in the State whose territory is entered by the aircraft . . . .
>
> \*　\*　\*　\*　\*　\*
>
> "(c) The benefits of this Article shall apply only to such States parties to this Convention, as either (1) are parties to the International Convention for the protection of Industrial Property and to any amendments thereof; or (2) have enacted patent laws which recognize and give adequate protection to inventions made by the nationals of the other States parties to this Convention."

The United States, Denmark, Norway, Sweden, Japan and The Netherlands are all parties to the Convention referred to and hence Article 27 applies to them.

Plaintiff emphasizes that Article I, Section 8 of the Constitution empowers the Congress "To promote the Progress of Science and useful Arts, by securing for limited Times to . . . Inventors the exclusive Right to their respective . . . Discoveries.", that 35 U. S.C. § 101 accords the inventor or discoverer of "any new and useful . . . machine . . . or any new and useful improvement thereof" the right to obtain a patent upon it, and that 35 U.S.C. § 154 provides that

> "Every patent shall contain . . . a grant to the patentee . . . for the term of seventeen years, of the right to exclude others from making, using, or selling the invention throughout the United States . . . . "

Plaintiff argues that if an invention is patentable, the Government is constitutionally precluded from according the inventor anything less than the exclusive

grant described in the Constitution and provided for in Section 154. Plaintiff argues that, in consequence, there can be no exception from the patent grant of foreign air carriers' regular and extensive uses of patentable inventions in the United States even if their uses are wholly confined to the needs of international air navigation, since that would make the patent grants non-exclusive, and the Congress has neither the power, constitutionally, so to limit patent grants nor has it done so in Section 154. Article 27 of the Chicago Convention is, therefore, plaintiff argues, invalid since it plainly licenses a very wide area of use, creates a wide rift of non-exclusivity in every patent covering articles incorporated in aircraft and needed in their navigation. Further, Plaintiff argues, Section 272, was first enacted after the Chicago Convention last came into effect and, enacted in far narrower terms, must be considered to have superseded Article 27 or, if not, at least greatly to have narrowed its field of application; and plaintiff contends, the same must be said of the Paris Convention, most recently amended and reconfirmed in 1962. Finally, Plaintiff argues, Section 272 itself (and Article 5ter of the Paris Convention), which relates only to foreign aircraft "temporarily or accidentally entering" this country, cannot be taken to cover the maintenance of a regular and systematic international aircraft service to the United states, including overflights of it.

It is concluded that the statute, Section 272, and the Paris Convention, Article 5ter, cannot be so narrowly interpreted as plaintiff contends, and that Article 27 of the Chicago Convention, Article 5ter, of the Paris Convention, and Section 272, are constitutionally valid as applied to the defendants' uses of plaintiff's patented engines, and, therefore, accord defendants a complete defense to the claims against them for patent infringement.

■ The constitutional provision is not self-executing. It empowers but does not command the Congress to grant patent rights, and the source of any specific patent right is the statute which defines the nature and extent of the patent right granted. See Deepsouth Packing Co. v. Laitram Corp., 1972, 406 U.S. 518, 525–526, 92 S.Ct. 1700, 32 L.Ed.2d 273. In Mast, Foos & Co. v. Stover Mfg. Co., 1900, 177 U.S. 485, 494, 20 S. Ct. 708, 712, 44 L.Ed. 856, the court observed sharply

"Congress having created the monopoly, may put such limitations upon it as it pleases."

Brown v. Duchesne, 1857, 60 U.S. (19 How.) 183, 15 L.Ed. 595 underlies Section 272. In that case, plaintiff sued defendant for infringing plaintiff's patent on a construction in a gaff for sailing vessels, charging that defendant had used the gaff improvement at Boston without consent. Defendant pleaded that he used the improvement only in the gaffs of a French schooner of which he was the master, being himself a subject of France, the vessel being one built in France and owned and manned by French subjects, and, at the time of the alleged infringement, upon a lawful journey under the flag of France from a colony of France to Boston and back to the colony, that the voyage was not ended on the date of the alleged infringement and that the gaffs were placed on the schooner at or near the time of her launching by the builder in order to fit her for the sea. The patentee demurred to the defense, and the Court treated the case as presenting the question whether any improvement in the construction or equipment of the foreign vessel on which there was a United States patent could be used by the vessel within the United States "while she is temporarily there for the purpose of commerce, without the consent of the patentee." 60 U. S. (19 How.) at 194.

■ The language of the patent laws, the Court agreed, was clear enough, if read literally, to apply to the use of the gaff improvement involved in the case. However, the Court thought that the power granted to the Congress to pass patent and copyright laws con-

ferred "no power on Congress to regulate commerce, or the vehicles of commerce, which belong to a foreign nation, and occasionally visit our ports in their commercial pursuits." 60 U.S. (19 How.) at 195. The power to regulate commerce and the treaty making power are separate and distinct powers of the general government and not connected with the power "domestic in its character" (*Id.*) to promote the progress of science by securing to inventors for a limited time the exclusive right to their discoveries. The patent laws are not intended to have extraterritorial operation. The Court differentiated between a profitable use of a patent, as by manufacturing gaffs in Boston and selling them there and the trifling use of the gaff improvement made by the French schooner in simply coming into port and ceasing to use the gaff when the vessel came to dockside. In this the Court saw no "real damage" sustained by the plaintiff, and no advantage gained by the defendant in the schooner's single trip or occasional trips into the United States. Although damage was presumed for purposes of maintaining an action in such cases, the Court noted, the patent laws do not embrace improvements on foreign ships lawfully made in their own country, for so to view the patent law would be to confer on the patentee the power to exact damages where no real damages had been sustained, and where to do so would seriously embarrass the commerce of the country with foreign nations. Further, such a construction, as the patentee called for, "would confer on patentees not only rights of property, but also political power, and enable them to embarrass the treaty-making power in its negotiations with foreign nations, and also to interfere with the legislation of Congress when exercising its constitutional power to regulate commerce." 60 U.S. (19 How.) at 197. The Court noted further that if the law was so interpreted, then the rights of the patentee could not be put aside by any treaty entered into by the United States. *Id.*

Brown v. Duchesne rejected the holding of an English case, which had reached a precisely opposite result; the English case was apparently promptly followed by the enactment of a statute, in 1852, providing that future patents should not extend to prevent the use of the invention in any foreign ship or for the navigation of any foreign ship in British ports, if the invention was not used for the manufacture of articles to be vended within or exported from Britain, provided that the new enactment's benefit should not extend to ships of any foreign state that failed to extend a similar benefit to British ships.

It will be seen that Brown v. Duchesne is to some extent the source of the ideas and language in Section 272, and that, independent of the existence of Section 272, the approach of Brown v. Duchesne to the problem approximated the British statutory solution.

The United States entered into the Paris Convention for the Protection of Industrial Property long before Section 272 was enacted in 1952. Article 5ter, in the 1925 and 1934 versions of the Paris Convention, if not in earlier ones, covered both vessels and air and land engines. The 1934 article provided that the use of any article forming the subject matter of a patent in the construction or operation of air or land locomotive engines of the other countries of the Union, or of accessories to these engines, when the latter enter the country temporarily or accidentally, should not be considered as infringing the rights of a patentee in any of the countries of the Union. The revisers note to Section 272 indicates that the Section was intended to follow the "requirement" of the Paris Convention to which the United States was a party, and that it also clarified the holding of the Supreme Court "that use of a patented invention on board a foreign ship does not infringe a patent."

 Although the Court might phrase it differently today, Brown v. Duchesne means at minimum that the patent law must not be so interpreted as

to impair the treaty-making capacity of the nation or to clog its power to regulate foreign commerce (since that would make patent grants a surrender *pro tanto* of "sovereignty" to private persons, *cf.* Norman v. Baltimore & O. R. Co., 1935, 294 U.S. 240, 316, 55 S.Ct. 407, 79 L.Ed. 885; Home Building & Loan Ass'n v. Blaisdell, 1934, 290 U.S. 398, 442–444, 54 S.Ct. 231, 78 L.Ed. 413), and that, hence, unless the language of the patent statute plainly compels it, the statute must not be taken to grant rights in terms so broad that existing or later treaties must necessarily constitute a "taking" of some part of the patentee's grant. The Court emphasized the "no damage" aspect in reaching its conclusion, but that does not mean that the Court was holding that only trivial uses could be considered non-infringing uses. The grant of the patent then, as now, granted the patentee the right to exclude others from making, using, or selling the article of the patent; the Court was dealing with an article made in France, sold in France and used in transoceanic travel and, finally, used to make and leave port on a voyage to the United States. The shipowner's significant uses of the art of the gaff patent were foreign to the United States, although the gaff was presumably indispensable for making and leaving port. Such a use within the United States would not, perhaps, today be characterized as trivial and non-damaging since it was inevitable and necessary, but it was not in fact different in kind and use-value from a foreign-owned aircraft's use of the Cali patent in one or more of its engines to land, turn about and take off.

In any event, the United States has in substance so interpreted its own patent laws in unhesitatingly becoming a party to the Paris Convention and the Chicago Convention, both of which specifically deal with the very subject matter of Brown v. Duchesne and Section 272, and do so in an historical evolution which furnishes an insight into the meaning of the word "temporarily" as used in the phrase "entering the United States temporarily or accidentally." Counsel have cited a passage from the record of the proceedings at the Hague Conference indicating that in a committee meeting in connection with the 1925 consideration of Article 5ter, subparagraph 2, the question of the significance of "temporarily" was brought up for discussion; the committee indicated that the words "temporarily" and "accidentally" were chosen to cover entries into port for more or less brief periods whether periodically or exceptionally and whether unintentionally or not.

The enactment of Section 272 and the adoption of Article 5ter would be incomprehensible if they were intended to cover only trivia. Their adoption implies that they were understood to create a useful immunity from infringement liability that was of enough importance to occupy the attention of the Congress and the negotiators of two treaties. Their language was chosen to deal with an internationally significant matter arising in a world in which scheduled freight and passenger services by established international carriers by air and sea were likely to require such an immunity to cover countless articles aboard aircraft or vessels that could turn out to be covered by patents in the United States that were without counterpart abroad. It is difficult to see any other purpose in Section 272 and Article 5ter than to meet the needs and realities of international trade and navigation. "Temporarily," then, could not sensibly mean any less than entering for the purpose of completing a voyage, turning about, and continuing or commencing a new voyage. The distinction would be between a Caravelle, manufactured in France and powered with such an engine, delivered here for use by an airline in this country for domestic traffic, even though manufactured and sold in France, and a foreign aircraft arriving here on an international flight only to unload, turn about, reload and depart.

But if that interpretation of Section 272 and Article 5ter were doubtful, the interpretation of Article 27 of the Chicago Convention is far too clear to debate and it is not, it is understood, claimed that Article 27 of the Chicago Convention is not literally sufficient to accord the defendant airlines a defense if it is valid. It is suggested that it is invalid simply because it is broader than Brown v. Duchesne, Section 272 and Article 5ter which may be taken among them to mark the constitutional limit of what may be subtracted from the grant to the patentee of the right to exclude all others from the use of his patent, and, in the case of the 1958 amendment and repromulgation of the Paris Convention, may be even taken as impliedly reducing the scope of any broader immunity that might be thought to have been granted by Article 27. However, the statute, including Section 272, and the two treaties are not inconsistent one with the other. For example, Article 27 says nothing about accidental entries (which might well not be authorized entries). But even if that were not so, the co-existence of the two treaty provisions is understandable and does not argue an inconsistency. The Paris Convention is not limited to aircraft or vessels or temporary or accidental entries. It covers the whole field of the Protection of Industrial Property "understood in the broadest sense" and it applies "not only to industry and commerce proper, but likewise to agricultural and extractive industries and to all manufactured or natural products" (Article 1 of the Paris Convention). The Chicago Convention is devoted to International Civil Aviation and not to the Protection of Industrial Property Rights; it deals with the facilitation of international aviation and the elimination of blocks and clogs to it. The two subjects intersect at the point where each considers patents used in international navigation by carriers foreign to the patent-granting country, and caution suggests that both treaties deal with the subject so that no argument could ever be made that one treaty, by failing to deal with it, impliedly repealed a provision in an earlier treaty.

■■ It does not quite appear to be argued that the defendants and their aircraft are not "of" foreign countries or national states within the potential scope of Section 272 and Articles 5ter and 27. The argument seems rather to be that the particular airlines involved, given the magnitude of their carrier operations between foreign countries and this country, are such that the airlines are comparable to American airlines in the extent of their use of the article of Cali's patent, and that, in consequence, the subtraction from the grant to Cali of the right to exclude others from the use of his patent is a very great subtraction and one hardly tolerable under the statutory and treaty language, which might be thought to deal only with relatively unimportant ("temporary" and "accidental") invasions of the patent right that are without commercial significance. That subtraction, although large, appears nevertheless plainly to be what the statutory and treaty immunities intend; substantiality in the subtractions of use from the exclusiveness of the grant of such patents as that to Cali, while not unreal, is within the treaty-making power. The foreign carriers' use is, in fact, not comparable to domestic airline use of the patent right; the sharply delimiting functional language greatly narrows the tolerated use.

■ It is suggested that a treaty diluting the exclusivity of the grant to Cali has to be regarded as, in essence, a governmental "taking." It is pointed out—and it is true—that once the United States has granted a patent under the existing patent law, it is itself required to pay tribute to the patentee if it uses the patent; as the government, it can take by condemnation a license under the patent (in effect) if required for a public use. But plaintiff's argument is circular when used to equate an exercise of the treaty-making power, or of the

**1128**

power to amend the patent statute, as a "taking" of patents not granted until after the treaty has been made or the statute amended. It starts from the premise that the nation's enactment of a general statute authorizing the grant to patentees of the right to exclude others from the making, selling and using of an article or process, excludes the United States from reserving the power by treaty or law to create, as it were, royalty free licenses under future-granted patents to foreign carriers to the limited extent spelled out in Section 272, Article 5ter and Article 27. The argument, thus, assumes that the rights of all patentees generally are paramount to the government's legislative power and its power to grant treaty rights to international carriers under American patents. Whatever might have been the case as to patents granted before Brown v. Duchesne, it has not been the case as to patents granted since the expiration of the patents then extant. All such later patents have Brown v. Duchesne read into them. The patent to Cali was granted in 1966, after Section 272 had been passed and after Articles 5ter and 27 had been included in the two Conventions here directly involved. They were integral limitations on the grant. The enactment of the patent law under the constitutional provision simply was not a compact with all future inventors never to make such treaties as the Paris and Chicago Conventions and never to add a Section 272 to the patent laws. That is what Brown v. Duchesne decided in pointing out that the patent law must not be interpreted to abridge the nation's capacity to carry on its treaty-making powers and its power to regulate foreign commerce.

It follows that plaintiff's motion for summary judgment in substance striking the defenses based on Section 272 and on Article 5ter of the Paris Convention and Article 27 of the Chicago Convention must be in all respects denied.

It is so ordered.