# United States Court of Appeals for the Federal Circuit

---

**ZOLTEK CORPORATION,**
*Plaintiff-Appellee,*

v.

**UNITED STATES,**
*Defendant,*

v.

**LOCKHEED MARTIN CORPORATION**
*Defendant-Appellant.*

---

2009-5135

---

Appeal from the United States Court of Federal Claims in case no. 96-CV-166, Judge Edward J. Damich.

---

Decided: March 14, 2012

---

JOE D. JACOBSON, Green Jacobson, P.C., of Clayton, Missouri, argued for plaintiff-appellee. Of counsel were DEAN A. MONCO and JOHN S. MORTIMER, Wood, Phillips, Katz, Clark & Mortimer, of Chicago, Illinois.

DONALD R. DUNNER, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, of Washington, DC, argued for defendant-appellant. With him on the brief were RICHARD

T. RUZICH, Duane Morris LLP, of Chicago, Illinois, MATTHEW C. MOUSLEY, of Philadelphia, Pennsylvania, and KERRY B. MCTIGUE, of Washington, DC, and SCOTT J. POPMA, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, of Washington, DC.

ANISHA DASGUPTA, Attorney, Appellate Staff, Civil Division, United States Department of Justice, of Washington, DC, argued for amicus curiae United States. With her on the brief were TONY WEST, Assistant Attorney General, and SCOTT R. MCINTOSH, Attorney.

JERRY STOUCK, Greenberg Traurig, LLP, of Washington, DC, for amicus curiae Federal Circuit Bar Association.

WILLIAM C. BERGMANN, Baker & Hostetler LLP, of Washington, DC, for amicus curiae Aerospace Industries Association of America, Inc.

---

Before RADER, *Chief Judge*, PLAGER and GAJARSA,[*] *Circuit Judges*.

RADER, *Chief Judge*, NEWMAN, LOURIE, BRYSON, LINN, PROST, MOORE, O'MALLEY, REYNA, and WALLACH, *Circuit Judges*, join Part I-B of this opinion. DYK, *Circuit Judge*, dissents from Part I-B.

GAJARSA, *Circuit Judge*.

This appeal represents the continuing saga of the Zoltek Corporation ("Zoltek") in its effort to obtain compensation for the alleged infringement of its patent. The

---

[*] Circuit Judge Gajarsa assumed senior status on July 31, 2011.

specific issue in this appeal is whether the Court of Federal Claims properly allowed Zoltek to amend its complaint and transfer its claim for infringement under 35 U.S.C. § 271(g) against Lockheed Martin Corporation ("Lockheed") to the United States District Court for the Northern District of Georgia. The trial court allowed the amendment and transfer because it concluded that the requirements of 28 U.S.C. § 1631, the transfer statute, were satisfied. On the facts of this case, however, amendment and transfer were legal error. Moreover, because the error in this case was precipitated in part by this court's earlier decision in *Zoltek Corp. v. United States* ("*Zoltek III*"), 442 F.3d 1345 (Fed. Cir. 2006) (per curiam; Gajarsa, J. concurring; Dyk, J. concurring; Plager, J. dissenting) we revisit the basis for that decision. Thus, in light of our revisiting of our earlier decision, we (1) reverse the trial court's decision here allowing amendment of Zoltek's complaint and transferring the amended complaint to the district court; and (2) we remand the case to the trial court for further proceedings consistent with this opinion.

BACKGROUND

Zoltek is the assignee of United States Reissue Patent No. 34,162 (the "RE '162 Patent"), entitled "Controlled Surface Electrical Resistance Carbon Fiber Sheet Product." Claims 1-22 and 33-38 relate to methods of manufacturing carbon fiber sheets with controlled surface electrical resistivity; claims 23-32 and 39-40 are product-by-process claims for the partially carbonized fiber sheets. Zoltek is presently asserting only the method claims, which generally contain two steps: partially carbonizing the fiber starting material and then processing those fibers into sheet products. The carbon fiber products at issue were used in the F-22, a fighter jet, which Lockheed designed and built pursuant to a contract with the Gov-

ernment. The F-22 contains two types of carbon fiber products: silicon carbide fiber mats ("Tyranno fibers"), which are fibrous reinforcing material, and prepregs ("Nicalon fibers"), which are pre-impregnated material typically used in the manufacture of high performance composites. *Zoltek Corp. v. United States* ("*Zoltek I*"), 51 Fed. Cl. 829, 831 & nn.1-2 (2002).

In its original complaint filed in 1996, Zoltek sued the United States under 28 U.S.C. § 1498(a), alleging that, without a license from Zoltek or other lawful right, the claimed invention covered by the RE '162 Patent was infringed because the resulting product was used or manufactured by or for the United States. At that time, Zoltek did not assert any claims against Lockheed. Under § 1498(a),

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

Section 1498(a) "is more than a waiver of immunity and effects an assumption of liability by the government." *Advanced Software Design Corp. v. Fed. Res. Bank*, 583 F.3d 1371, 1375 (Fed. Cir. 2009) (quoting *Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 344 (1928)).

The United States ("Government") moved for partial summary judgment arguing that 28 U.S.C. § 1498(c) precluded Zoltek's recovery for the Government's use of the method claims. *Zoltek I*, 51 Fed. Cl. at 830. Section

1498(c) states that "[t]he provisions of this section shall not apply to any claim arising in a foreign country." The manufacturing of the Tyranno and Nicalon fibers begins in Japan, where the fibers are "partially carboniz[ed]." *Zoltek Corp. v. United States* ("*Zoltek II*"), 58 Fed. Cl. 688, 690 (2003). The fibers are then imported into the United States, where they are processed into sheets.[1] *Id.* The Government argued Zoltek's claim arose in a foreign country and, therefore, its sovereign immunity was not waived.

The trial court held in *Zoltek I* that § 1498 "does not [waive the Government's sovereign immunity as] to all forms of direct infringement as currently defined in 35 U.S.C. § 271." 51 Fed. Cl. at 837. The trial court, however, did not rule on the Government's summary judgment motion, but stayed the motion pending additional briefing concerning Zoltek's ability to assert a claim for a taking of its patent rights under the Fifth Amendment. *See id.* at 839. It subsequently denied the Government's motion, holding that Zoltek could assert a takings claim. *Zoltek II*, 58 Fed. Cl. at 707. Both parties appealed.

In our per curiam opinion, the panel majority reversed the trial court's ruling that Zoltek could allege patent infringement as a Fifth Amendment taking under the Tucker Act. *Zoltek III*, 442 F.3d at 1353 (per curiam). In the same opinion, the panel majority affirmed the trial court's conclusion that Zoltek's infringement allegations were precluded by § 1498, but—unlike the trial court and the dissent—the majority cited § 1498(a) as the basis for

---

[1] In *Zoltek III*, this court stated that the Nicalon fibers were manufactured *and* formed into sheet products in Japan. 442 F.3d at 1349. This statement was contrary to the facts as found by the trial court, *see Zoltek Corp. v. United States* ("*Zoltek IV*"), 85 Fed. Cl. 409, 411 n.1 (2009), and we correct it here.

the holding, without reaching the issue of § 1498(c). *Id.* In doing so, the panel majority relied on *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1316 (Fed. Cir. 2005), for the proposition that "direct infringement under section 271(a) is a necessary predicate for government liability under section 1498." *Id.* at 1350. Because "a process cannot be used 'within' the United States as required by section 271(a) unless each of the steps is performed within this country," we held that a § 1498 remedy is foreclosed "where, as here, not all steps of a patented process have been performed in the United States." *Id.* (citing *NTP*, 418 F.3d at 1318). We then remanded the case for further proceedings. *Id.* at 1353.

On remand, Zoltek sought leave to amend its complaint to add a claim against Lockheed for infringement of the RE '162 Patent's method claims under 35 U.S.C. § 271(g) and to transfer that claim to the Northern District of Georgia pursuant to 28 U.S.C. § 1631. The trial court explained that it lacked jurisdiction over Zoltek's claims against the Government based on this court's holding in *Zoltek III* and that the Northern District of Georgia would have jurisdiction over Zoltek's claim for infringement against Lockheed. *Zoltek IV*, 85 Fed. Cl. at 413, 418.

The trial court rejected the Government's argument that on the basis of the grant of immunity for contractors provided in § 1498(a), there is no jurisdiction in the Northern District of Georgia. The second paragraph of § 1498(a) states that "the use or manufacture of an invention described in and covered by a patent of the United States by a contractor . . . for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States." According to the trial court, "§ 1498(a) only insulates government contractors from suit when the Government

can be found liable," and even if § 1498(a) insulated government contractors from liability, transfer was still proper because § 1498(a) is an affirmative defense and not a jurisdictional bar. *Id.* at 418-19.

The trial court also found that it was in the interest of justice to transfer the claim because (1) it was plausible that without transfer at least part of Zoltek's claim for infringement against Lockheed would be time-barred; (2) Lockheed had participated in the suit through discovery beginning in 1997 and was aware that its product was the subject of this litigation; and (3) Zoltek was the first plaintiff to discover "a legislative gap between the definition of infringement under § 1498 and the definition of infringement under § 271." *Id.* at 420-21. The trial court thus granted Zoltek leave to amend its complaint. Based upon the trial court's determination, Zoltek amended its complaint.

Subsequently, the Court of Federal Claims certified the following controlling question of law to this court for interlocutory appeal: "whether 28 U.S.C. § 1498(c) must be construed to nullify any government contractor immunity provided in § 1498(a) when a patent infringement claim aris[es] in a foreign country." *Zoltek Corp. v. United States*, No. 96-cv-166, Dkt. No. 385 (May 14, 2009) ("Certified Order"). This court accepted the appeal explaining that the issues before the court are "whether the trial court should have transferred the case and whether the court should have allowed the complaint to be amended to add Lockheed as a defendant." *Zoltek Corp. v. United States*, Misc. No. 903, 2009 WL 3169301, *1 (Fed. Cir. Sept. 30, 2009). We have jurisdiction pursuant to 28 U.S.C. § 1292(d)(2).

DISCUSSION

Under 28 U.S.C. § 1631, transfer is appropriate if (1) the transferor court lacks jurisdiction; (2) the action could have been brought in the transferee court at the time it was filed; and (3) transfer is in the interest of justice. This court reviews the trial court's grant of a motion to transfer a claim for an abuse of discretion, but issues of law are reviewed de novo. *See Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1342-43 (Fed. Cir. 2008). As we stated in *Zoltek III*, the issues before the court in this case are purely questions of law. 442 F.3d at 1349. And as we shall explain, the trial court inadvertently erred as a matter of law in authorizing the amendment and the transfer of Zoltek's claim against Lockheed.

I.

In confronting the question of whether a contractor acting under Government authority could be held liable for patent infringement, in a situation in which we had previously held the Government not liable for the allegedly infringing actions of its contractor, we realized that one of two consequences would result. Either we had to conclude that a patentee's well-pleaded complaint of infringement in the United States of a United States patent in these circumstances fails to state a cause of action against both the Government and the Government's contractor, or we would have to override the longstanding understanding of the statutory framework that a contractor working for the Government is immune from individual liability for patent infringement occurring in the course of conducting the Government's contract.

This caused us to re-examine the premises on which our earlier opinion in *Zoltek III* was based, and to reconsider the consequences of that opinion. As we shall ex-

plain, we have concluded that the change in law effected by this court's decision in *Zoltek III*, which limited the scope of § 1498(a) to direct infringement under § 271(a), is in error, and must be corrected. We note that, before arriving at this conclusion, we reviewed the briefs and arguments before the court in the earlier appeal that resulted in the *Zoltek III* opinion, as well as the trial court's several opinions and, of course, the briefs and arguments in this phase of the case. Since our re-examination of the case in effect reinstates the Government's potential liability under §1498(a) for the infringement alleged in this case, we particularly note that the Government has been an active participant in all phases of the trial and appeals in this case, including oral argument in the present appeal even though the case was nominally between Zoltek and Lockheed Martin.

## A.

As explained below, the *Zoltek III* panel's limitation of § 1498(a) to infringement under § 271(a) is inconsistent with the plain language of the statute, and in deciding to limit § 1498(a), the panel misapplied its own case law. That error significantly limits the protection that § 1498(a) provides to government contractors, which, in this case, results in Lockheed having liability for conduct otherwise immunized by § 1498(a). It creates the possibility that the United States' procurement of important military matériel could be interrupted via infringement actions against government contractors—the exact result § 1498 was meant to avoid. And finally, it vitiates the Congressional scheme, spread across three Titles in the United States Code, *see* 35 U.S.C. §§ 154(a)(1), 271(g), 19 U.S.C. § 1337, and 28 U.S.C. § 1498, which is meant to give relief to process patent holders when the resulting products of their patented process are used within the

United States—regardless of where the process is practiced.

Before analyzing *Zoltek III*'s interpretation of § 1498, we review the history of the adoption of that section. In *Schillinger v. United States*, the Supreme Court held that patent infringement was a tort for which the Government had not waived sovereign immunity. 155 U.S. 163, 167-69 (1894). Thus, absent conduct by the United States from which a contract to license the patent could be inferred, a patent holder lacked a remedy for infringement by the United States. *Id.* at 169-71.

In response to the perceived injustice of the *Schillinger* rule, Congress enacted the precursor to 28 U.S.C. § 1498, which provided:

> That whenever an invention described in and covered by a patent of the United States shall hereafter be used by the United States without license of the owner thereof or lawful right to use the same, such owner may recover reasonable compensation for such use by suit in the Court of Claims.

Act of June 25, 1910, Pub. L. No. 61-305, 36 Stat. 851 (1910) ("1910 Act"); *see also Crozier v. Fried. Krupp Aktiengesellschaft*, 224 U.S. 290, 304 (1912) (describing the history of the 1910 Act).

In 1918, the Supreme Court applied the 1910 Act to the issue of patent infringement by government contractors in the course of producing warships during World War I. *William Cramp & Sons Ship & Engine Bldg. Co. v. Int'l Curtis Marine Turbine Co.*, 246 U.S. 28 (1918). Despite the contractor's construction of warships pursuant to "comprehensively detailed" specifications provided by the Navy, the Court found that the 1910 Act did not shield the contractor from infringement. *Id.* at 42-43.

Reaction to the Court's March 4, 1918 decision was swift. On April 20, Acting Secretary of the Navy Franklin D. Roosevelt wrote a letter to the chairman of the Senate Committee of Naval Affairs, stating that the Navy was

> confronted with a difficult situation as the result of [the] decision by the Supreme Court affecting the government's rights as to the manufacture and use of patented inventions, and it seems necessary that amendment be made of the Act of June 25, 1910 . . . . [T]he decision is, in effect, . . . that a contractor for the manufacture of a patented article for the government is not exempt . . . from injunction and other interference through litigation by the patentee.

> A prior decision of the Supreme Court, that in the case of *Crozier v. Krupp* [224 U.S. 290] had been interpreted as having the opposite meaning, and the department was able up to the time of the later decision, on March 4 last, to proceed satisfactorily with the procuring of such patented articles as it needed, leaving the matter of compensation to patentees for adjustment by direct agreement, or, if necessary, by resort to the Court of Claims under the above-mentioned act of 1910. Now, however, manufacturers are exposed to expensive litigation, involving the possibilities of prohibitive injunction payment of royalties, rendering of accounts, and payment of punitive damages, and they are reluctant to take contracts that may bring such severe consequences. The situation promised serious disadvantage to the public interests, and in order that vital activities of this department may not be restricted unduly at this time, and also with a view of enabling dissatisfied patentees to obtain just and adequate

> compensation in all cases conformably to the declared purpose of said act, I have the honor to request that the act be amended by the insertion of a proper provision therefore in the pending naval appropriation bill.

*Wood v. Atl. Gulf & Pac. Co.*, 296 F. 718, 720-21 (D. Ala. 1924) (quoting letter). In response to this letter, the 1910 Act was amended to provide

> That whenever an invention described in and covered by a patent of the United States shall hereafter be used *or manufactured* by *or for* the United States without license of the owner thereof or lawful right to use *or manufacture* the same, such ~~owner may recover~~ *owner's remedy shall be by suit against the United States in the Court of Claims for the recovery of his* reasonable *and entire* compensation for such use *and manufacture* ~~by suit in the Court of Claims~~.

Act of July 1, 1918, Pub. L. No. 65-182, 40 Stat. 704, 705 (1918) (additions in italics; deletions struck through).

As a result of the amendment, the Government not only waived sovereign immunity for its own unlawful use or manufacture of a patented invention, but, in most cases, assumed liability when its contractors did so. *See Richmond Screw*, 275 U.S. at 343-44. Moreover, when applicable, the amendment made the specified remedy exclusive. *Id.* at 344. Indeed, the Supreme Court said:

> The purpose of the amendment was to relieve the contractor entirely from liability of every kind for the infringement of patents in manufacturing anything for the government, and to limit the owner of the patent and his assigns . . . to suit against the United States in the Court of Claims

for the recovery of his reasonable and entire compensation for such use and manufacture. The word 'entire' emphasizes the exclusive and comprehensive character of the remedy provided.

*Id.* at 343. *See also Identification Devices v. United States*, 121 F.2d 895, 896 (D.C. Cir. 1941); *Pollen v. Ford Instrument Co.*, 108 F.2d 762, 763 (2d Cir. 1940).

To the degree that any doubt existed, Congress further clarified the scope of the 1918 amendment by enacting what is now the second paragraph of 28 U.S.C. § 1498(a), which reads:

[T]he use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

Act of Oct. 31, 1942, Pub. L. No. 77-768, § 6, 56 Stat. 1013, 1014; *see also* S. Rep. No. 77-1640 (1942) at 1 (stating that the purpose of the second paragraph of § 1498 is "[t]o clarify existing legislation . . . with respect to contractors and subcontractors manufacturing and using inventions for the Government").

These provisions were codified in their modern form in 1949:

Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of [Federal] Claims for the

recovery of his reasonable and entire compensation for such use and manufacture.

＊ ＊ ＊ ＊

For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

Act of May 24, 1949, Pub. L. No. 81-72, § 87, 63 Stat. 89, 102 ("1949 Act"); *see also* 28 U.S.C. § 1498(a).[2]

As enacted, this could be read to permit suit against the United States for the unlawful use or manufacture of patented inventions abroad, e.g., under foreign patent law. *See* H.R. Rep. No. 86-624, at 6-7 (1959) (letter from William Macomber, Jr., Assistant Secretary of State). Indeed, at least one plaintiff brought suit in the Court of Claims seeking compensation for such activities. *See Yassin v. United States*, 76 F. Supp. 509, 511, 513-14 (Ct. Cl. 1948). To clarify the scope of § 1498, Congress introduced a geographic limitation, which is now codified at 28 U.S.C. § 1498(c): "The provisions of this section shall not

---

[2]  The statute was first codified as 35 U.S.C. § 68 (1926). The re-codification at 28 U.S.C. § 1498 substantially altered the text. *See* Act of June 25, 1948, Pub. L. No. 80-773, 62 Stat. 869, 941 (1948) (enacting into positive law as 28 U.S.C. § 1498). The codified text was revised shortly thereafter to "restate[] its first paragraph to conform more closely with the original law." H.R. Rep. No. 81-352, at 11 (1949); *see also* 1949 Act § 87. The 1949 Act is identical to the current text of the first sentence of 28 U.S.C. § 1498(a), with the exception of the name of the Court of Federal Claims.

apply to any claim arising in a foreign country." Act of Sept. 8, 1960, Pub. L. No. 86-726, § 1, 74 Stat. 855, 855; *see also* H.R. Rep. No. 86-624, at 1. Within that historical framework, we turn to the terms of the statute and their application to this case.

## B.

In doing so we find that this court's holding in *Zoltek III*, which found liability under 35 U.S.C. § 271(a) to be a predicate to government liability under § 1498, must be corrected because it 1) was contrary to the plain language of § 1498; 2) relied on dicta and a fundamental misreading of the statute; 3) impermissibly rendered subsection (c) of § 1498 inoperative; and 4) caused 19 U.S.C. § 1337(l) to become ineffective while ignoring Congress's clear intent. Since a panel of this court cannot reverse a prior panel decision, the court *sua sponte* voted to take Part I-B of this opinion en banc for the limited purpose of vacating the *Zoltek III* opinion. The active judges, consisting of RADER, Chief Judge, NEWMAN, LOURIE, BRYSON, LINN, PROST, MOORE, O'MALLEY, REYNA, and WALLACH, Circuit Judges, voted to vacate the *Zoltek III* opinion. DYK, Circuit Judge, dissents from the en banc portion of the opinion. *See Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 n.* (Fed. Cir. 1999) (reversing prior precedent through an en banc vote on one part of an opinion), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 n.5 (Fed. Cir.1998) (same); *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 876 n.16 (Fed. Cir. 1988) (same).

### i.

It is fundamental that "[t]he starting point in every case involving construction of a statute is the language

itself." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472 (1977) (internal quotation marks omitted). Section 1498 waives the United States' sovereign immunity from suit. Thus, it must be strictly construed in favor of the United States. *Blueport Co. v. United States*, 533 F.3d 1374, 1378 (Fed. Cir. 2008) (citing *Lane v. Pena*, 518 U.S. 187, 192 (1996)). Any ambiguity in the statute must be resolved in favor of immunity. *See Lane*, 518 U.S. at 192.

Section 1498(a) allows for suit against the Government "[w]henever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right" and provides that government contractors would be immune from suit for such use or manufacture. *See* 28 U.S.C. § 1498(a). The scope of the Government's waiver of sovereign immunity thus depends on the meaning of (1) "an invention described in and covered by a patent"; (2) "used or manufactured by or for the United States"; and (3) "without license of the owner [of the patent] or lawful right" to do so. *Id.* Moreover, this language must be interpreted in accordance with its ordinary meaning in 1910, when Congress enacted § 1498's precursor. *See Perrin v. United States*, 444 U.S. 37, 42 (1979) (stating that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning" at the time Congress enacted the statute).

The language "described in and covered by a patent" has been part of § 1498 since its precursor was enacted in 1910. *See* 1910 Act. Based on Supreme Court case law and the Patent Act at the time of the 1910 Act, for an invention to be "described in and covered by a patent," the invention must be claimed in the patent. *See Lehigh Valley R.R. Co v. Mellon*, 104 U.S. 112, 119 (1881) ("[T]he scope of letters-patent should be limited to the invention

covered by the claim . . . ."); *see also* Patent Act of 1870, 41 Cong. Ch. 230, § 26, 16 Stat. 198, 201 (1870) ("Patent Act of 1870") (stating that the patent "shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery"). In the intervening years, both the relevant case law and subsequent amendments to the Patent Act are consistent with this understanding of "described in and covered by a patent."

Moving next to the "used or manufactured" language, we note that at the time the amendment to the 1910 Act was adopted, the Patent Act gave the patentee "the exclusive right to make, use, and vend the . . . invention or discovery." Patent Act of 1870 § 22. The Supreme Court has explained that "make" and "use" were not "technical terms." *Bauer & Cie v. O'Donnell*, 229 U.S. 1, 10 (1913). It stated that "make . . . embraces the construction of the thing invented [and t]he right to use is a comprehensive term and embraces within its meaning the right to put into service any given invention." *Id.* at 10-11. As explained above, the "invention" is what is claimed in the patent. Thus, to "use" an invention, each limitation of the claims must be present in the accused product or process. *See Sargent v. Hall Safe & Lock Co.*, 114 U.S. 63, 86 (1885) (holding the defendant did not infringe where its product lacked an element of the asserted claim).

The last phrase we must interpret, "without license of the owner thereof or lawful right," has also been part of § 1498(a) since the 1910 Act. "Without license of the owner" means simply that the owner has not given the Government a license to use the patented invention. Early variants of the bill that would ultimately become the 1910 Act lacked the requirement that the use or manufacture be "without . . . lawful right." H.R. 7653, 60th Cong., 42 Cong. Rec. 6,164 (1908); S. 7676, 59th

Cong., 41 Cong. Rec. 1,344 (1907). Congress added the requirement in order to make clear that the United States would not be liable for manufacturing or using inventions created by its employees in the course of their employment, a lawful shop right under then-existing law. *See* H.R. Rep. No. 61-1288, at 3-4 (1910) (citing *Solomons v. United States*, 22 Ct. Cl. 335 (1887), *aff'd*, 137 U.S. 342 (1890)); 45 Cong. Rec. 8,757 (1910). Of course, the words of the limitation are not confined to the Government's shop rights. Instead, they carve out from the Government's assumption of liability all lawful uses, i.e. all uses which are not covered by the scope of the patent grant. *See United States v. Palmer*, 128 U.S. 262, 271-72 (1888) (noting that a patent grants a monopoly against citizen and Government alike, but questioning the availability of a remedy for infringement by the United States); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1283 (Fed. Cir. 1988) (Rich, J.) (stating that a patent is a grant of the right to exclude others from violating the patent grant in Title 35, but § 1498 modifies the grant so the Government may use what it needs), *abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-94 (2006). In short, lawful right refers to the United States' right to use or manufacture an invention—without liability under § 1498—in all cases where other unlicensed parties can do so without directly infringing a patent. *See Garlock*, 842 F.2d at 1283 ("The government has graciously consented . . . to be sued . . . for what would be infringement if by a private person.").

Thus, § 1498(a) waives the Government's sovereign immunity from suit when (1) an invention claimed in a United States patent; (2) is "used or manufactured by or for the United States," meaning each limitation is present in the accused product or process; and (3) the United States has no license or would be liable for direct in-

fringement of the patent right for such use or manufacture if the United States was a private party. Section 1498 makes no reference to direct infringement as it is defined in § 271(a). Indeed, so interpreting § 1498(a) is contrary to its plain language, interpreted in light of the meaning of that language in 1910.

ii.

Moreover, the panel majority's per curiam interpretation of § 1498(a) in *Zoltek III* was rooted in a fundamental misreading of the statute. The panel failed to rely on the plain language of the statute, but premised its conclusion on *NTP, Inc. v. Research in Motion, Ltd.*, which stated that "direct infringement under section 271(a) is a necessary predicate for government liability under section 1498." 418 F.3d 1282, 1316 (Fed. Cir. 2005) (citing as authority a footnote in *Motorola, Inc. v. United States*, 729 F.2d 765, 768 n.3 (Fed. Cir. 1984)). However, *NTP* did not involve the United States as a party and was interpreting 35 U.S.C. § 271(a), not 28 U.S.C. §1498; the court referred to § 1498(a) only to provide a framework for analyzing § 271(a). *See id.* at 1315-16 (interpreting "use *within* the United States" under 271(a)). Therefore, this court's statement in *NTP* regarding the scope of § 1498 was not a holding of the case and accordingly such dictum is not binding.

*NTP* itself was relying on dictum from *Motorola* when it referred to § 1498(a). In *Motorola*, this court cited to *Decca Ltd. v. United States*, 640 F.2d 1156, 1167 (Ct. Cl. 1980) and stated that "the Government can only be sued for any direct infringement of a patent (35 U.S.C. § 271(a)), and not for inducing infringement by another (section 271(b)) or for contributory infringement (section 271(c))." 729 F.2d at 768 n.3. However, in 1984, § 271(g) had not been enacted and § 154(a)(1) did not include the

right to exclude others from using products made by a patented process—statutory provisions that were not implemented until 1988. Process Patents Amendment Act of 1988 ("PPAA"), P.L. 100-418, §§ 9002, 9003, 102 Stat. 1107, 1563-64 (1988). Therefore, at that time it was logical to use those sections of Title 35 to illustrate the idea that § 1498 requires direct infringement and does not apply to indirect infringement. But using § 271(a) as shorthand to define direct infringement under § 1498 was not a holding of the case and did not reflect *Motorola*'s holding, which was that § 1498 did not incorporate 35 U.S.C. § 287. *Motorola*, 729 F.2d at 769. Tellingly, that statement appeared in a footnote listing some of the several differences between a § 1498 action and one under Title 35. *Id.* at 768 n.3.

In *Decca*, the Court of Claims, our predecessor court, concluded that § 1498(a) did not waive the Government's sovereign immunity for indirect infringement under 35 U.S.C. §§ 271(b) and (c). 640 F.2d at 1169-70. *Decca* did not hold, as *Motorola* assumed, that § 1498(a) is synonymous with infringement under § 271(a). Rather, the court "h[e]ld that 35 U.S.C. §§ 271(b) and (c) are not incorporated by implication in [§] 1498." *Id.* at 1170. The court explained that inducement and contributory infringement are outside § 1498(a) because they "do not involve *the Government's* making or using a patented invention . . . ." *Id.* at 1170 & n.31 (emphasis added). In coming to this conclusion, the court recognized the importance of the language in § 1498(a), which is limited to inventions that are "used or manufactured by or for the United States." The court stated simply:

> Because section 1498 is an eminent domain statute, the Government has consented there under only to be sued for its taking of a patent license. Expressed differently, section 1498 is a waiver of

> sovereign immunity only with respect to a direct governmental infringement of a patent. Activities of the Government which fall short of direct infringement do not give rise to governmental liability because the Government has not waived its sovereign immunity with respect to such activities. Hence, the Government is not liable for its inducing infringement by others, for its conduct contributory to infringement of others, or for what, but for section 1498, would be contributory (rather than direct) infringement of its suppliers. Although these activities have a tortious ring, the Government has not agreed to assume liability for them. In short, under section 1498, the Government has agreed to be sued only for its direct infringement of a patent.

*Id.* at 1167. Nothing in that statement can be read to mean that § 1498 requires as a predicate liability under § 271(a). In fact, that statement indicates that any direct infringement that would normally require a license by a private party falls under § 1498. Therefore, we are not mandated by *NTP*, *Motorola*, or *Decca* to conclude that direct infringement under §1498 equates to direct infringement under § 271(a).

### iii.

Furthermore, *Zoltek III*'s limitation of § 1498(a) to § 271(a) renders § 1498(c) superfluous, violating the canon of statutory construction that "a statute should be interpreted so as not to render one part inoperative." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 131 S.Ct. 1101, 1111 (2011) (citation and internal quotation marks omitted). Section 271(a) requires that the infringing activity occur "*within* the United States." (emphasis added). Yet § 1498(c) provides the exact same limitation by eliminat-

ing the Government's liability "for a claim arising in a foreign country." By limiting § 1498(a) to activities within the United States, the panel in *Zoltek III* rendered § 1498(c) superfluous. Section 1498(c), however, is not superfluous. Congress specifically added this section to 28 U.S.C. § 1498 to ensure that the Government would not be held liable for claims arising abroad. *See* H. Rep. No. 86-624, at 5-6 (1959).

Thus, when the panel in *Zoltek III* concluded that the Government's liability under § 1498(a) is limited to infringement under § 271(a), it was relying on dictum as expressed by *NTP*, and not the tools of statutory construction. The plain language of § 1498(a) indicates that § 1498(a) operates independently from Title 35. Indeed, this court so held in *Motorola*, where we said that "[a]lthough a section 1498 action may be similar to a Title 35 action, it is nonetheless only parallel and not identical." *Motorola*, 729 F.2d at 768. Instead of relying on any infringement sections in § 271, § 1498(a) creates its own independent cause of action.

iv.

Finally, *Zoltek III*'s interpretation of § 1498 eliminated the effect of 19 U.S.C. § 1337(l) even though "[w]e must read the statutes to give effect to each if we can do so while preserving their sense and purpose." *Watt v. Alaska*, 451 U.S. 259, 267 (1981) (citing *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). *Zoltek III* negated Congress's clear intent to protect products resulting from a patented process, wherever practiced, when it rendered § 1337(l) ineffective, thereby limiting the remedies of parties in situations similar to Zoltek's.

Title 19 U.S.C. section 1337 allows process patent holders to petition the International Trade Commission to exclude the

> importation into the United States, . . . or the sale within the United States after importation by the owner, importer, or consignee of articles that . . . are made, produced, processed, or mined under, or by means of, a process covered by the claims of a valid and enforceable United States patent.

19 U.S.C. § 1337(a)(1)(B)(ii).  Therefore, subject to the other requirements of § 1337, Zoltek could at least prevent the importation of products made by its patented process.  However, under § 1337(l), entitled "Importation by or for United States,"

> [a]ny exclusion . . . in cases based on a proceeding involving a patent, . . . under subsection (a)(1) of this section, shall not apply to any articles imported by and for the use of the United States, or imported for, and to be used for, the United States with the authorization or consent of the Government.

Thus, when products resulting from a patented process are imported for the United States, such as by a government contractor, the process patent owner cannot exclude the products from entering the United States.  However, in the same subsection, Congress gave process patent owners in such a predicament a remedy:

> Whenever any article would have been excluded from entry . . . but for the operation of this subsection, an owner of the patent . . . adversely affected shall be entitled to reasonable and entire compensation in an action before the United States Court

of Federal Claims pursuant to the procedures of section 1498 of Title 28.

19 U.S.C. § 1337(l).  Based on the plain language of § 1337, Congress clearly intends that patent holders *shall* have a remedy under 28 U.S.C. § 1498 for the importation of products made by a patented process if the products could have been excluded under § 1337.  By continuing to require § 271(a) liability as a predicate for liability under § 1498(a), *Zoltek III*, relying on the perpetuation of the dictum in *NTP*, disturbed Congress's statutory scheme and intent.  *See* S. Rep. No. 93-1231, at 1999 (1974) (commenting on the purpose of subsection (i), later redesignated as subsection (l), and stating that "*Any* patent owner adversely affected by this subsection would be entitled to reasonable and entire compensation pursuant to 28 U.S.C. 1498. [sic]" (emphasis added)).

Title 35 U.S.C. section 271(a) does not protect against the importation of products made by a patented process, but § 271(g) states that "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer."  Because § 1337 unambiguously asserts Congress's intent to give process patent owners a remedy for importation of products made using their process, it would be incorrect to maintain *Zoltek III*'s holding that § 271(a) infringement is a predicate to United States liability under § 1498.  If *Zoltek III* is correct, a process patent holder who requests a § 1337 exclusion order from the International Trade Commission to prevent the importation of articles to be used by or for the United States will be denied such relief by operation of § 1337(l).  But the patentee will be directed to obtain "reasonable and entire compensation" from the United States, which he "shall" be entitled to in the Court of Federal Claims

under § 1498.  *See* § 1337(l).  However, under *Zoltek III*, the patentee will be denied relief because his claim cannot be predicated on § 271(a).  *Zoltek III* vitiated the effect of 19 U.S.C. § 1337(l), and as explained above, it relied on dicta to refute the plain language of 28 U.S.C. § 1498(a) and render superfluous 28 U.S.C. § 1498(c).  Therefore, that opinion is vacated by the court en banc. [3]

## II.

While this court in *Zoltek III* was incorrect when it determined that infringement under § 271(a) is a predicate for Government liability under § 1498(a), we must now determine as a matter of law whether Lockheed's actions create Governmental liability under § 1498(a).  Under § 271(g), Lockheed allegedly infringed Zoltek's patents when it used in the United States, or imported into the United States, the product made using the pat-

---

[3]    The dissent contends that this court lacks jurisdiction to address the question whether section 1498(a) is limited to infringement under 35 U.S.C. § 271(a), because that question is not within the scope of the order on appeal.  In fact, however, the transfer order that is the subject of this appeal was predicated in part on the trial court's conclusion that it lacked jurisdiction over the claim before it, *see* 28 U.S.C. § 1631, and that conclusion followed from the trial court's application of this court's earlier decision in *Zoltek III*.  This court's act of vacating *Zoltek III* thus directly affects the transfer order that is on appeal here.  For that reason, this case is entirely different from *United States v. Stanley*, 483 U.S. 669 (1987), on which the dissent relies, in which the court of appeals improperly addressed an entirely different theory of liability from the one at issue in the order on appeal.  With respect to the substantive objections raised by Judge Dyk, he reiterates the same rationale he espoused in his concurrence in *Zoltek III*, which is still not mandated by the dicta of the cases upon which he relies.

ented process. 35 U.S.C. § 271(g). The issue is whether that act falls under § 1498(a), thus giving Lockheed immunity from suit and Zoltek the right to compensation from the Government. To be within the parameters of § 1498(a), Lockheed must have used the invention without a license and without lawful right. Lockheed clearly was not licensed to practice Zoltek's invention. Therefore, the issue is whether they had the lawful right to do so. As explained above, we have defined "without lawful right" for purposes of § 1498(a) as use of an invention that, if done by a private party, would directly infringe the patent. The liability of the United States under § 1498 is thus linked to the scope of the patent holder's rights as granted by the patent grant in title 35 U.S.C. section 154(a)(1). As the patent grant has expanded over the years, so too has the coverage of § 1498(a). If a private party had used Zoltek's patented process to create the resulting product, there would be liability for infringing Zoltek's patent right under § 154(a)(1) and § 271(g). We hold that the Government is subject to the same liability in this case, and that precedent and legislative intent dictate that result.

## A.

In *Quanta Computer, Inc. v. LG Elecs., Inc.*, the Supreme Court held that in the patent exhaustion context, "methods . . . may be 'embodied' in a product." 553 U.S 617, 628 (2008). The holding was necessary to avoid "an end-run around exhaustion" where "[p]atentees seeking to avoid patent exhaustion could simply draft their patent claims to describe a method rather than an apparatus." *Id.* at 629-30. This concept was not applied to 35 U.S.C. § 271(f) in *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, because method patents do not have physical components that could be combined outside the United States as prohibited by § 271(f). 576 F.3d 1348, 1364

(Fed. Cir. 2009) (en banc). That does not mean, however, that the concept is not applicable under § 1498 because §§ 154(a)(1), 271(g), and 1498(a) are applicable to process patents. Although the process itself was partially practiced outside the United States in this case, the product resulting from the practice, which embodies the patented process, was imported into, or used in, the United States. Therefore the process has been "used" without a license or lawful right. A contrary result would similarly avoid infringement by the United States. Additionally, contractors could practice the processes overseas whereby the resulting product would be immunized from exclusion from importation under § 1337.

To allow such a result is contrary to the PPAA's legislative history, which reflects the understanding that to protect process patents is to protect the products resulting from the process. Although "use" of the invention "without lawful right" does not use the exact same terms as § 271(g), we can look to Judge Learned Hand for guidance. He notes that, "Courts have not stood helpless in such situations; the decisions are legion in which they have refused to be bound by the letter, when it frustrates the patent purpose of the whole statute." *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (citing Justice Holmes for the proposition that "it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before." *Johnson v. United States*, 163 F. 30, 32 (1st Cir. 1908)). The Supreme Court approvingly quoted Judge Learned Hand in *Cabell* and said:

> Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes

of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

*Watt v. Alaska*, 451 U.S. 259, 266 n.9 (1981) (quoting 148 F.2d at 739).

As explained above, the plain language of the statute is clear. Additionally, the legislative purpose behind § 1498 is clear. The Supreme Court has stated that § 1498(a) was meant to "relieve the contractor entirely from liability of every kind for the infringement of patents in manufacturing anything for the government" in order "to stimulate contractors to furnish what was needed for the war, without fear of becoming liable themselves for infringements . . . ." *Richmond Screw*, 275 U.S. at 343-45. This purpose survives today.

In 1988, the patent grant under § 154(a)(1) was expanded to state "if the invention is a process," the patent shall contain a grant to the patentee, his heirs or assigns, "of the right to exclude others from using or selling throughout the United States, or importing into the United States, products made by that process." PPAA § 9002. Section 271(g) was also added at that time to clarify that violating this right is an act of infringement. § 9003. Section 154(a)(1) was modified, and section 271(g) was adopted, by Congress because "[i]n order to make patent protection of a process meaningful, it is . . . necessary to consider the patented process and the resulting product as a *whole*, with the consequence that process protection is automatically extended to the resulting product even if the said product has not been claimed." S.

Rep. No. 100-83, at 31 (1987) (citations omitted and emphasis added).

The purpose supporting the changes was to harmonize United States law with that of the rest of the industrialized world, in which "most countries' patent laws are structured so that the direct product of a patented process is also included within the scope of the patent." *Id.*; *accord* H. Rep. No. 100-60, at 4 (1987). Congress noted that previously, "[w]ith respect to process patents, courts have reasoned that the only act of infringement is the act of making through the use of a patented process; therefore, there can be no infringement if that act occurs outside the United States." H. Rep. 100-60, at 5 (1987) (citations omitted). Congress then noted that "this rationale is not adequate because it ignores the reality that *the offending act is the importation of a product* made through the use of a protected process patent or its subsequent sale within the United States." *Id.* at 6 (emphasis added).

Thus, because the scope of the Government's "lawful right" to "use" the invention under § 1498(a) is determined by the scope of § 154(a)(1), Congress's expansion of the patent grant makes § 1498(a) cover the use of a product that incorporates the patented process by which it was created. We agree with the argument made by the Federal Circuit Bar Association in its amicus brief that no revision to § 1498(a) was necessary to reach this result; it was accomplished by the expansion of the patent grant. Amicus Brief of the Fed. Cir. Bar Ass'n at 14.

We recognize that this "court may not read an amendment to one section of a statute as an amendment to an entirely different section of the statute in the absence of any statutory justification." *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1258 (Fed. Cir. 2000). In

*Rotec*, we analyzed an amendment to 35 U.S.C. § 271(a) and determined that it did not apply to § 271(f). *Id.* at 1257-58. It would seem that *Rotec*'s rule would be especially applicable here since it may appear that we have determined that the amendment of one statute is an amendment to a completely different statute, rather than simply different sections of the same statute. But, in this case, as explained above, there is compelling statutory justification for such an interpretation. However, such a justification is not even necessary because "lawful right" is linked to the scope of the patent grant; we are not amending the meaning of lawful right—that was done by Congress. We are simply stating the effect the amendment to the patent grant had on § 1498(a), which is defined by its terms and the patent grant.

Therefore, based on clear Congressional intent to protect contractors from infringement so that the Government's important business may not be disturbed, it would be absurd to find that the importation or use of a product created through the use of a patented process as prohibited by 35 U.S.C. §§ 154(a)(1) and 271(g) fails to be the equivalent of use of the invention without lawful right to do so.

This is illustrated by a simple example. Had Lockheed practiced the process overseas without bringing the resulting products back to the United States, there would be no direct infringement of Zoltek's patent rights under § 271(a) or (g). Additionally, Zoltek would have no remedy against the Government under § 1498. As held in *NTP*, there would be no infringement under § 271(a) because all steps of the patented process were not carried out "within the United States." 418 F.3d 1282, 1318. There would be no § 271(g) infringement because none of the products made using the patented process were ever present in the United States as required by the statute.

35 U.S.C. § 271(g). Additionally, as explained below, the Government would not have waived its sovereign immunity under § 1498 because § 1498(c) states that the section does not apply to claims arising in a foreign jurisdiction, and a claim arising from an act which has no connection to the United States arises overseas. Essentially, as long as the products made by the patented process overseas are not imported into, or used within, the United States, Lockheed has the lawful right to use the patented process under § 1498(a) because the "within the United States" requirements of §§ 154(a)(1), 271(a), and 271(g) are not met, and § 1498(c) is implicated by the claim arising outside the jurisdiction of the United States.

When it imported the resulting products into the United States, or used them within the United States, Lockheed used Zoltek's patented invention "without license of the owner thereof or lawful right to use or manufacture the same . . ." because it is the act of *importation or use in the United States* of the products *made by the patented process* that constitutes improper use of a patented invention. As explained, the products themselves embody the patented invention for the purposes of § 1498. It could be argued that importing the resulting products is not the same as "use" of the invention under the literal terms of § 1498 because the process itself is the invention, not the resulting products. In light of the modification, however, of the patent grant (§ 154(a)(1)) and adoption of 35 U.S.C. § 271(g), and considering the effect of Congress's mandate in 19 U.S.C. § 1337(l), in the context of § 1498, the product of a patented process is not only the product, but also the physical embodiment of the invention. Therefore, Lockheed's actions constitute use of the invention without lawful right under the terms of § 1498(a).

### B.

We must now determine whether 28 U.S.C. § 1498(c) applies to this case. Section 1498(c) states that "[t]he provisions of [§ 1498(a)] shall not apply to any claim arising in a foreign country." The partially carbonizing step used to make the products alleged to infringe the RE '162 Patent occurs in Japan, while the processing step occurs in the United States. Thus, the question here is whether a claim "aris[es] in a foreign country" when one step of the claimed method is performed in a foreign country and another step is performed in the United States.

Congress amended § 1498 to add subsection (c) in 1960. Pub.L. 86-726, § 1, 74 Stat. 855, 856 (1960) (adding copyrights to the scope of § 1498). Congress wanted "to avoid liability for claims arising out of infringements of patents or copyrights in a foreign country." S. Rep. No. 86-1877, at 5 (1960). Indeed, the plain language of § 1498(c) eliminates Government liability for claims "arising in a foreign country" not claims arising under foreign law. Section 1498(c) was adopted "to remove the possibility of [the bill] being interpreted as applying to acts of infringement in foreign countries." *Id.* at 7.

However, in this case, § 1498(c) does not exempt the United States from liability because the infringing acts—use or importation of the products resulting from the process—occurred in the United States. Importation occurs when the product crosses the United States' border, and use occurs within the United States. Both of those acts occur within the United States and any claim regarding those acts similarly arises within the United States. There is no infringement in a foreign country because the patent grant and the infringement statutes do not cover activities that occur outside the United

States.  *See* 35 U.S.C. §§ 154(a)(1), 271.  Because the resulting products were imported or used in the United States, Zoltek's claim for relief does not "arise" in a foreign country and § 1498(c) does not apply to this case. This conclusion is supported by precedent; the legislative histories of section 154(a)(1)'s modification and the enactment of section 271(g); and Congress's intent to create a comprehensive scheme meant to protect contractors, inventors, and the United States.

Accordingly, we hold that for the purposes of section 1498, the use or importation "within the United States [of] a product which is made by a process patented in the United States" constitutes use of the invention without lawful right because the products embody the invention itself.  We add that nothing in this opinion should be construed to affect our Title 35 jurisprudence.

## SUMMARY

In its original suit before the Court of Federal Claims, Zoltek alleged infringement by the Government of its patent, and a right to recover compensation therefore by virtue of 28 U.S.C. § 1498(a).  The trial court ruled for the Government on the § 1498 issue on the basis of its understanding of § 1498(c) as applied to these facts, but permitted Zoltek's case to go forward on its theory of a taking of its patent rights under the Fifth Amendment.  We now hold:

1.  28 U.S.C. § 1498(a) creates an independent cause of action for direct infringement by the Government or its contractors that is not dependent on 35 U.S.C. § 271(a). Direct infringement under § 1498(a) comes within the scope of the right to exclude granted in 35 U.S.C. §154(a)(1).  Thus, under § 1498(a) the Government has waived its sovereign immunity for direct infringement, which extends not only to acts previously recognized as

being defined by § 271(a) but also acts covered under § 271(g) due to unlawful use or manufacture. Therefore, as in this case, when the product of a patented process is used in, or imported into, the United States by or for the United States, there is direct infringement for the purposes of a § 1498 action. We do not decide the issue of indirect infringement, under §§ 271(b), (c), and (f), which is not before us. Zoltek has filed a complaint with well-pleaded allegations against the Government for infringement under § 1498(a). The trial court's holding to the contrary is reversed, and the case is remanded for further proceedings in accordance with this opinion;

2. Properly understood, § 1498(c) has no application to the facts of this case in which a United States patent was allegedly infringed by activities that took place within the United States. Thus § 1498(c) does not bar Zoltek's suit against the Government. The trial court's holding to the contrary is reversed;

3. When the United States is subject to suit under § 1498(a) for alleged infringement of a patent by a contractor acting by and for the United States, the contractor by law is rendered immune from individual liability for the alleged infringement. The trial court's holding to the contrary on appeal in this case is reversed; and

4. Since the Government's potential liability under § 1498(a) is established, we need not and do not reach the issue of the Government's possible liability under the Constitution for a taking. The trial court's determinations on that issue are vacated.

CONCLUSION

**REVERSED IN PART, VACATED IN PART, AND REMANDED**

COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

---

**ZOLTEK CORPORATION,**
*Plaintiff-Appellee,*

**v.**

**UNITED STATES,**
*Defendant,*

**v.**

**LOCKHEED MARTIN CORPORATION**
*Defendant-Appellant.*

---

2009-5135

---

Appeal from the United States Court of Federal Claims in case no. 96-CV-166, Judge Edward J. Damich.

---

DYK, *Circuit Judge*, dissenting.

This court en banc overrules our precedent that 28 U.S.C. § 1498(a) is limited to infringement under 35 U.S.C. § 271(a), precedent which led to a holding in this very case that the United States was not liable under section 1498(a) for infringement of a method patent outside the United States. *Zoltek Corp. v. United States*, 442 F.3d 1345, 1350 (Fed. Cir. 2006). The Supreme Court denied certiorari. *Zoltek Corp. v. United States*, 551 U.S. 1113 (2007).

The overturning of this earlier *Zoltek* decision here is accomplished through the extraordinary approach of sua sponte en banc action where the issue was not argued by any of the parties, and where the government itself was not a party to the appeal but participated only as amici curiae. In my view the en banc decision is beyond our jurisdiction and, in any event, is clearly incorrect on the merits. I respectfully dissent.

## I Jurisdiction

This case comes to us as an interlocutory appeal certified pursuant to 28 U.S.C. § 1292(d)(2), which provides that an interlocutory appeal may be permitted if a judge of the Claims Court, "in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation." The legislative history of this exception indicates that it "should only be used in exceptional cases where an intermediate appeal may avoid protracted and expensive litigation." H.R. Rep. No. 85-1667, at 2 (1958).

After our 2006 holding in this case that the United States was not liable for infringement under section 1498(a), the Claims Court allowed the complaint to be amended to state an infringement claim against Lockheed and granted Zoltek's motion to transfer this claim to the United States District Court for the Northern District of Georgia. *Zoltek v. United States*, 85 Fed. Cl. 409, 422 (2009). In connection with the transfer order, the Claims Court recognized that it could only transfer claims under 28 U.S.C. § 1631 if, inter alia, "the transferee court would have had jurisdiction at the time the original case was filed." *Id.* at 413. On motion by Lockheed, the Claims

Court amended its transfer order and certified as a controlling question of law for interlocutory appeal under 28 U.S.C. § 1292(d)(2) the issue of "whether 28 U.S.C. § 1498(c) must be construed to nullify any government contractor immunity provided in § 1498(a) when a patent infringement claim 'aris[es] in a foreign country.'" Transfer Order, *Zoltek Corp. v. United States*, No. 96-166 C (Fed. Cl. May 14, 2009), ECF No. 385. The Claims Court's theory apparently was that, although the Northern District of Georgia would have jurisdiction over the claims against Lockheed, it would be more efficient to determine before transfer whether Zoltek's claim was viable.

It seems clear to me that the certified order does not confer appellate jurisdiction over the earlier dismissal of the claims against the United States. The Supreme Court has stated that for interlocutory appeals under section 1292(d)(2), "appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996).[1] However, "[t]he court of appeals may not reach beyond the certified order to address other orders made in the case," and may only "address any issue fairly included within the certified order." *Id.*

Here, the certified order was limited to transferring claims against Lockheed. The certified order does not confer appellate jurisdiction over the earlier dismissal of infringement claims against the United States. This

---

[1] *Yamaha* was interpreting 28 U.S.C. § 1292(b), which allows for certified interlocutory appeals from district courts. Because the language of sections 1292(b) and 1292(d)(2) are substantially similar, the Supreme Court's analysis is equally applicable here. *See United States v. Connolly*, 716 F.2d 882, 884-85 (Fed. Cir. 1983).

attempt to reach beyond the certified order is nearly identical to that rejected by the Supreme Court in *United States v. Stanley*, 483 U.S. 669 (1987).

In *Stanley*, a veteran filed suit against the government in district court under the Federal Tort Claims Act ("FTCA"), alleging negligence in the administration of a drug testing program in which he participated while on active duty. *Id.* at 672. The district court granted the government's motion for summary judgment, finding that the veteran's claims were precluded by *Feres v. United States*, 340 U.S. 135 (1950), because they arose out of injuries related to his service. *Stanley*, 483 U.S. at 672. On appeal, the court of appeals agreed that *Feres* barred Stanley's FTCA claims against the government, though holding that the district court should have dismissed the claim against the government for lack of subject matter jurisdiction rather than disposing of the case on its merits. *Id.*

Thereafter, the veteran filed an amended complaint, naming as defendants certain government officers and alleging constitutional claims against those individuals under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). *Stanley*, 483 U.S. at 674. The district court entered an order refusing to find these claims barred, but it certified the order for interlocutory appeal under section 1292(b). *Id.* at 675. On appeal again, the court of appeals affirmed the district court's conclusion with respect to the individual defendants. *Id.* However, the court of appeals also indicated that, due to intervening precedent, the veteran "might have a viable FTCA claim against the United States, and that law-of-the-case principles therefore did not require adherence to the [prior] holding that [the veteran's] FTCA claim was barred by *Feres*." *Id.* at 675-76. The court of appeals remanded the case to the district court with instructions

to allow the veteran the opportunity to again plead an FTCA claim against the government for injuries related to his service. *Id.* at 676.

On review, the Supreme Court vacated the court of appeals decision with respect to claims against the United States. The Court held that because the order appealed from was an order only refusing to dismiss the claims against the individual defendants, "[t]he Court of Appeals . . . had no jurisdiction to enter orders relating to [the veteran's] long-dismissed FTCA claims" against the United States, even though the issues involved with the two types of claims were "closely parallel[]." *Id.* at 677. The Court emphasized that the court of appeals decision on appeal to allow the district court to reinstate a claim against the government was "particularly astonishing in light of the fact that the United States was not even a party to the appeal." *Id.*

Here, as in *Stanley*, the certified order itself in no way addressed any claims against the government. This court, in accepting this certified appeal, explained that the issues before it were "whether the trial court should have transferred the case and whether the court should have allowed the complaint to be amended to add Lockheed as a defendant." *Zoltek Corp. v. United States*, Misc. No. 903, 2009 WL 3169301, at *1 (Fed. Cir. Sept. 30, 2009). There was no mention in either the Claims Court order or this court's order of claims against the government. As the Court found in *Stanley*, it is astonishing that the majority's opinion has the effect of reinstating a cause of action against the government where the government was not even a party to the appeal. Under *Stanley*, this court lacks jurisdiction to order reinstatement of claims against the government when the certified order addressed only the transfer of claims against a

different defendant.[2]  The en banc court's action is also particularly striking insofar as it vacates the earlier *Zoltek* decision that the United States is not liable on a takings theory.  This theory of liability is not even tangentially related to Zoltek's claims against Lockheed, and has no relationship whatsoever to the transfer order.

## II The Merits

The majority's interpretation of section 1498 is also in my view incorrect.  Section 1498(a) currently provides, in relevant part:

> Whenever an invention described in and covered by a patent of the United States is *used or manufactured by or for the United States* without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

28 U.S.C. § 1498(a) (emphasis added).  This provision does not specify where the "use[] or manufacture[] by or for the United States" must occur.  However, this provision, as with the patent laws generally, must be interpreted in light of the presumption against extraterritoriality which, strikingly, the majority here

---

[2]    The majority urges that this case is different from *Stanley* because this court's decision as to the government's liability "directly affects the transfer order that is on appeal here."  Maj. Op. at 25 n.3.  This is not correct.  The necessary basis for the order transferring the claims against Lockheed pursuant to section 1631 was the Claims Court's lack of jurisdiction over the Lockheed claims, not a lack of jurisdiction over the claims against the government.

does not even mention. In light of this presumption, section 1498(a) was clearly intended to be limited to "use[] or manufacture[]" of the invention only within the United States. This necessarily excludes infringement under 35 U.S.C. § 271(g) that does not depend on use or manufacture in the United States but instead on the importation into the United States of a product created by a patented process performed abroad. Nothing in the legislative history of section 1498(a) indicates that it was designed to have extraterritorial reach or that a later enacted statute, such as section 271(g), could extend its extraterritorial scope.

"It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arabian Am. Oil Co.* ("*Aramco*"), 499 U.S. 244, 248 (1990) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). In applying this presumption, courts "look to see whether language in the [relevant Act] gives any indication of a congressional purpose to extend its coverage" outside of the United States. *Id.* (alteration in original) (internal quotation mark omitted). Because we must "assume that Congress legislates against the backdrop of the presumption against extraterritoriality," unless Congress's affirmative intention for a provision to govern extraterritorial activity is "clearly expressed," a statute is interpreted with the narrower scope. *Id.* Thus, unless congressional intent indicates to the contrary, the statutory language "applies domestically, not extraterritorially." *Small v. United States*, 544 U.S. 385, 391 (2005). For example, in *Foley Brothers*, a statute provided that "[e]very contract made to which the United States . . . is a party" must have a provision permitting no more than eight hours of work in a single day. 336 U.S. at 282. Despite the broad lan-

guage of the act itself, the Supreme Court held that this provision did not apply to a contract between the United States and a private contractor for work to be done in Iraq and Iran. *Id.* at 285. Applying the presumption against extraterritoriality, the Court concluded that there was nothing in the text of the statute itself or in the legislative history "which would lead to the belief that Congress entertained any intention other than the normal one in this case." *Id.* at 286-88.

The presumption against extraterritoriality is particularly strong under the patent statutes, and is reinforced by the requirement of narrow construction of a waiver of sovereign immunity. *See United States v. Nordic Village, Inc.*, 503 U.S. 30, 33 (1992). In interpreting some of the earliest patent laws, the Supreme Court emphasized that the Patent Clause of the Constitution itself "is domestic in its character, and necessarily confined within the limits of the United States." *Brown v. Duchesne*, 60 U.S. 183, 195 (1856). Thus, the laws enacted by Congress under the Patent Clause "secure to the inventor a just remuneration from those who derive a profit or advantage, *within the United States*, from his genius and mental labors. . . . [T]hese acts of Congress do not, and were not intended to, operate beyond the limits of the United States . . . ." *Id.* (emphasis added). This presumption against extraterritorial interpretation and application of the patent laws has remained strong since *Brown*. As the Supreme Court noted recently in *Microsoft Corp. v. AT&T Corp.*, "[t]he presumption that United States law governs domestically but does not rule the world applies with particular force in patent law." 550 U.S. 437, 454-55 (2007).

This presumption against extraterritoriality, articulated in *Brown*, existed long before Congress enacted the precursor to section 1498 in 1910. Act of June 25, 1910,

Pub. L. No. 61-305, 36 Stat. 851.[3]   Indeed, just a few years after the act of 1910 was passed, the Supreme Court reemphasized that "[t]he right conferred by a patent under our law is confined to the United States and its territories and infringement of this right cannot be predicated of acts wholly done in a foreign country." *Dowagiac Mfg. Co. v. Minn. Moline Plow Co.*, 235 U.S. 641, 650 (1914) (citation omitted).

Section 1498(a) on its face does not indicate that it was designed to have extraterritorial scope.  Nor does the legislative history of section 1498(a) suggest any intent to have the section operate extraterritorially.   Since its original enactment in 1910, this provision has been triggered whenever an invention is "used or manufactured by or for the United States."  Under the presumption against extraterritoriality, absent a contrary indication by Congress, the general phrase "use[] or manufacture[]" in the statute must refer only to use or manufacture within the United States, and not to use or manufacture abroad.

This is even clearer in light of the enactment of section 1498(c) in 1959, which provides that "[t]he provisions of [section 1498] shall not apply to any claim arising in a foreign country."  Section 1498(c) was added at the same time that section 1498(b)—a parallel right of suit with

---

[3]   It should be noted that although section 1498 is now codified under Title 28, the precursor to section 1498 was originally codified together with other substantive patent law provisions. *See, e.g.*, Compiled Statutes of the United States 1913, tit. 60, ch. 1, § 9465.  Indeed, from the introduction of the United States Code in 1926 until 1948, this provision was codified in section 68 of Title 35. *See* 35 U.S.C. § 68 (1946) (section titled "Suit for unlicensed use of invention by the United States").  Thus, as a provision of patent law itself, the presumption against extraterritoriality should apply with "particular force" in interpreting section 1498. *See Microsoft*, 550 U.S. at 455.

respect to infringements of copyrights committed by the government—was added. *See* H.R. Rep. No. 86-624 (1959). The addition of subsection (c) was primarily to "provide that the provisions of this bill shall have no effect on any claim for copyright infringement against the U.S. Government arising in a foreign country." *Id.* at 1. But it was also designed to reemphasize the fact that section 1498(a) requires use or manufacture within the United States. *See id.* at 7.

In a closely analogous situation involving section 271(a) itself, the Supreme Court in *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1971), reaffirmed this principle of non-extraterritoriality. In *Deepsouth*, which was decided before sections 271(f) and (g) were added to Title 35, the Court recognized that section 271(a), adopted as part of the Patent Act of 1952, did not change the law with respect to infringement. *Id.* at 530 & n.10. Instead, it merely codified the understanding of infringement present at the time it was enacted. *Id.* Furthermore, the Court held that direct infringement under section 271(a)—i.e., making, using or selling a patented invention—was limited to activity occurring within the United States. *Id.* at 522-23. Thus, under the patent laws, "it [was] not an infringement to make or use a patented product outside of the United States." *Id.* at 527. The same follows for section 1498(a). At the time of its enactment, it was "not an infringement to make or use a patented product outside of the United States." *Id.* Because infringement can only be premised on activity within the United States, section 1498(a) applies only where the "use[] or manufacture[] by or for the United States" occurred within the United States. *See also Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2884-85 (2010).

In a number of similar cases involving extraterritoriality, the Supreme Court has made clear that each trig-

gering event defined in the statute—here, use or manu-facture—must occur in the United States even though other events create a United States nexus. For example, in *Small*, the issue was whether a statute which made it "unlawful for any person . . . who has been convicted in any court" to possess a firearm encompassed foreign as well as domestic convictions. 544 U.S. at 387. Even though the statute covered only domestic possession and there was therefore some nexus to the United States, *id.* at 389, the Court determined that it "should apply an ordinary assumption about the reach of domestically oriented statutes," that is, it assumed that Congress intended each part of the statute to apply domestically, not extraterritorially, unless congressional intent was explicitly otherwise. *Id.* at 390-91. Because the statute's language and legislative history did not suggest any intent to reach extraterritorial convictions as a predicate for domestic liability, it concluded that "convicted in any court" referred only to domestic courts. *Id.* at 394.

Most recently, in *Morrison*, the Second Circuit, while rejecting the claim in the particular case, reiterated that section 10(b) of the Securities Exchange Act of 1934 permits a cause of action for domestic misconduct in connection with securities traded on foreign exchanges.[4] 130 S. Ct. at 2879. The Supreme Court disagreed and, relying on the presumption against extraterritorial appli-cation, held that the statute applied only to domestic sales or purchases. *Id.* at 2881-83. It rejected the argument that the "manipulative or deceptive" conduct occurred in

---

[4] Section 10(b) provides that "[i]t shall be unlawful . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).

the United States, and thus the statute was merely being applied domestically. *Id.* at 2883-84. The Supreme Court explained that "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States" and that "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Id.* at 2884. Thus, because "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States," finding jurisdiction over domestic misconduct related to securities traded on foreign exchanges would nonetheless violate the presumption against extraterritoriality. *Id.*

The majority here makes the same mistake as the Second Circuit made in *Morrison*. The majority assumes that section 1498(a) has no extraterritorial application under its interpretation because there is a sufficient nexus to the United States—that is, the statute applies only if the product made abroad by the patented process is ultimately used in the United States. This approach ignores the plain language of section 1498(a). Section 1498(a) is clear that it applies "[w]henever an *invention* . . . is *used*." The invention here is a *process*. A process is not "used" in the United States "unless *each* of the steps is performed within this country." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005) (emphasis added). This process was not "used" in the United States—it was used in a foreign country and then the resulting product was imported into the United States. The use of the invention is thus plainly extraterritorial. The fact that section 1498(a) could have been written to indicate that infringement liability was triggered upon a domestic event, such as domestic use of the product, is irrelevant. As it exists, the language of section 1498(a)

applies only to "use or manufacture" of an invention in the United States. That did not occur here.

Significantly, in the past, Congress has been explicit when it has expanded the extraterritorial reach of section 1498(a), as it did when it enacted 19 U.S.C. § 1337(*l*). In 1940, Congress amended the trade statutes to provide that the importation of a product made abroad by a patented process constituted an unfair trade practice under section 1337, and could therefore be excluded. Act of July 2, 1940, Pub. Law No. 76-710, 54 Stat. 724. Later, in the Trade Act of 1974, Congress provided that exclusion orders could not be issued for articles imported by or for the use of the United States. Act of Jan. 3, 1975, Pub. L. No. 93-618, § 341(A), 88 Stat. 1978. Instead, Congress provided a remedy against the government under section 1498(a) in such situations, providing that whenever a patent owner is denied exclusion for "any articles imported by and for the use of the United States," such owner "shall be entitled to reasonable and entire compensation in an action before the United States Court of Federal Claims pursuant to the procedures of section 1498 of Title 28." 19 U.S.C. § 1337(*l*).

Section 1337(*l*) did not create *infringement* liability for products produced abroad by a patented process. This occurred only in 1988 when section 271(g) was added. No similar extension of section 1498(a) was adopted when section 271(g) was enacted. Nothing could more clearly demonstrate that if Congress intended section 1498(a) to cover infringement under section 271(g), it would have said so specifically as it did with excluded products in section 1337(*l*). *See Aramco*, 499 U.S. at 256 (holding that "[i]t is also reasonable to conclude that had Congress intended Title VII to apply overseas, it would have addressed the subject of conflicts with foreign laws and procedures," as it had explicitly done when it amended

the Age Discrimination in Employment Act of 1967 to apply abroad). I note that the majority also urges that section 1337(*l*) somehow has no effect unless section 1498(a) is read to include infringement under section 271(g). Maj. Op. at 22. The predecessor to section 1337(*l*) was enacted in substantially its present form in 1974, long before section 271(g) existed. Thus, for years before section 271(g) existed, section 1337(*l*) provided a valid remedy under section 1498(a) for the non-exclusion of "articles imported by and for the use of the United States." There is no need to read section 1498(a) to incorporate section 271(g) to make sense out of section 1337(*l*).

Finally, the majority mistakenly urges that the government's liability under section 1498(a) is otherwise coextensive with potential government contractor liability, and that section 1498(a) must therefore be interpreted to incorporate section 271(g). There is no such principle underlying section 1498(a).[5] Even under the majority's interpretation of section 1498(a) there are circumstances in which a contractor, in the course of a government contract, could potentially be held liable for patent infringement while the government is protected from suit by its sovereign immunity. The majority itself concedes that section 1498 only waives "the Government's sovereign immunity from suit when . . . the United States . . . would be liable for *direct infringement* of the patent right for such use or manufacture if the United States was a private party." *Id.* at 16 (emphasis added); *see also Decca Ltd. v. United States*, 640 F.2d 1156, 1167 (Ct. Cl. 1980) ("[S]ection 1498 is a waiver of sovereign immunity only with respect to a direct governmental infringement of a

---

[5] This argument, moreover, assumes that the contractor would be liable when the government is not, an issue presented in this case but not addressed by the majority.

patent." (footnote omitted)).  Accordingly, the government has not waived its sovereign immunity with respect to indirect infringement by a contractor under sections 271(b), (c), and (f).[6]  Thus, there is no anomaly in interpreting section 1498(a) as not incorporating section 271(g) infringement.

To the extent this interpretation of section 1498(a) might reveal a "loophole" in the patent laws excusing the United States from infringement liability for use in the United States of products produced abroad using a patented process, that "is properly left for Congress to con-

---

[6]    Section 271(f) was added in 1984 and provided liability where someone within the United States supplied the components of a patented invention to be assembled outside of the United States.  Patent Law Amendments Act of 1984, Pub. L. No. 98-622, 98 Stat. 3383.  It is clear that section 271(f) did not create liability for direct infringement.  The language of section 271(f) itself mimics the language of the indirect infringement provisions of sections 271(b) and (c).  *Compare* 35 U.S.C. § 271(f)(1) (". . . actively induce the combination . . ."), *with* 35 U.S.C. § 271(b) (". . . actively induces infringement . . ."); *compare* 35 U.S.C. § 271(f)(2) (". . . component of a patented invention . . . not a staple article or commodity of commerce suitable for substantial noninfringing use . . ."), *with* 35 U.S.C. § 271(c) (". . . component of a patented [invention] . . . not a staple article or commodity of commerce suitable for substantial noninfringing use . . .").  Furthermore, section 271(f) was enacted in response to the Supreme Court's opinion in *Deepsouth*, which held that shipping the constituent parts of a patented device overseas for assembly was not an act of direct infringement.  406 U.S at 528; *see also* Patent Law Amendments of 1984, S. Rep. No. 98-663, at 6 (1984) ("This proposal responds to a comment by the United States Supreme Court in [*Deepsouth*] calling for a legislative solution to close a loophole in patent law.").

sider, and to close if it finds such action warranted." *Microsoft*, 550 U.S. at 457.  I respectfully dissent.